**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| IRVEN WADE, | Case No. 2:18-cv-01927-RFB-EJY |
| Plaintiff, | **ORDER** |
| v. | |
| UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA, | |
| Defendant. | |

### I. INTRODUCTION

Before the Court are Defendant University Medical Center of Southern Nevada's ("UMC") Motion for Partial Summary Judgment and Plaintiff Irven Wade's ("Plaintiff" or "Mr. Wade") Motion for Summary Judgment. ECF Nos. 27, 28. For the following reasons, the Court denies both motions.

### II. PROCEDURAL BACKGROUND

Plaintiff began this lawsuit when he filed a complaint on October 5, 2018, bringing a claim under the Patient Protection and Affordable Care Act (42 U.S.C. §18116). ECF No. 1. UMC answered the complaint on December 21, 2018. ECF No. 8. On October 30, 2019, both parties moved for summary judgment. ECF Nos. 27, 28. The motions were fully briefed. ECF Nos. 29–32. This written order now follows.

### III. FACTUAL BACKGROUND

The Court makes the following findings of undisputed and disputed facts:

### a. Undisputed Facts

Plaintiff Irven Wade is a deaf person who communicates primarily through American Sign Language. On March 15, 2015, Plaintiff went to UMC's emergency room after breaking both of his wrists in a motorcycle accident on that same day. Plaintiff was accompanied by a friend Brandy, who uses American Sign Language and who requested an interpreter for Plaintiff. Plaintiff was at the hospital from March 15 through March 18, 2015. During that time period, no live interpreter was provided to Plaintiff. During his stay at the hospital, Mr. Wade underwent a procedure in which his wrists were re-broken in order to reduce swelling prior to surgery. Mr. Wade was supposed to then receive an "urgent, but not emergent" surgery, but the procedure was postponed for unclear reasons. Frustrated at the lack of response and able to procure a surgery and live interpreter at a hospital in Sacramento, where Mr. Wade is based, Mr. Wade left UMC against doctor's orders and later received treatment in Sacramento.

Prior to the procedure in which Plaintiff's wrists were re-broken, UMC provided Plaintiff with two separate consent forms to sign. On the second page of the consent form, there is a separate space for an interpreter to sign the form acknowledging that an interpreter was used to interpret the form and indicating the date and time that the interpretation services were rendered. The interpretation section of the form was left blank. UMC staff relied on Mr. Wade's friend Brandy to explain the procedure to Plaintiff. A plan of care form from UMC noted that Mr. Wade had a "hearing deficit" and that it would be necessary to obtain a hearing interpreter, however no evidence establishes that a hearing interpreter or video remote interpreting services were provided for Plaintiff. Hospital records indicate that video remote interpretive technology was used by the hospital during a time period corresponding to Plaintiff's stay, but there is no documentation showing that Mr. Wade, as opposed to another deaf patient in the hospital at the same time,

received the services.

Rather than use an interpreter, UMC staff and physicians attempted to communicate with Plaintiff through writing and lip reading. For example, in medical records dated March 17, 2015, Dr. Colby Young noted that Plaintiff was "deaf, and a mute, so my primary communication with him was obtaining the medical records through the chart and outlining his injuries with written communication with me writing the specific questions and recommendations down on a piece of paper."

On his last day at UMC, Plaintiff's sister, Kaddie, went to the hospital to take Mr. Wade back to Sacramento. While there, she requested an interpreter for Plaintiff, however UMC's staff instead relied on Kaddie to act as an interpreter on that day, even though Kaddie is not a qualified interpreter. The writeup of Plaintiff's discharge stated that because Mr. Wade was deaf, they "consented him by writing out the risks, benefits, alternatives and procedure, and this was explained to him by his sister."

UMC's policies and procedures at the time required UMC to make certified/qualified interpreters and translators available to people who are deaf or hard of hearing. A UMC interpreter is required whenever a physician or UMC staff member is providing information or explaining care that may have a direct impact on the deaf person's health, treatment or wellbeing, or for completing consent forms, medical and treatment documents, complaint forms, and intake forms. There is no prerequisite under UMC policy that there be a written or oral request for an interpreter made by the patient. Family members are not supposed to be used as interpreters except during emergencies.

### b. Disputed Facts

The parties dispute whether video remote interpretation (VRI) services were used during

Plaintiff's hospitalization, and whether UMC was placed on notice of Plaintiff's need for an interpreter. Plaintiff stated that both he and a friend requested an interpreter for him several times. Plaintiff explained during his deposition that although the doctors and nurses would give him notes to read, that "he was "very emotional at the time," and that he had "a lot of anxiety at that point," and that he "couldn't communicate," and "needed body language." Plaintiff contends that four separate requests for an interpreter were made. The first was through his friend Brandy at the site of the accident, when Brandy asked the EMTs to ensure an interpreter would be present at the hospital. The second time was at the emergency room, when Plaintiff states that he requested an interpreter through his friend Brandy. The third request happened the morning after Plaintiff's hospital admission, and the last occurred during his discharge while Kaddie was present. UMC disputes whether each of these alleged instances happened, and if they did, whether they properly put UMC on notice of Plaintiff's need for a reasonable accommodation. The parties also dispute the legal effect of the circumstances—namely whether use of notes and lipreading constituted effective communication and appropriate auxiliary aids and services for Plaintiff.

### IV.   LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322(1986).

When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts …. Where

the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted). It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. Zetwick v. Cty. of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

**V.     DISCUSSION**

**a.  Legal Standard for Section 1557 Claims**

The Affordable Care Act incorporates the enforcement mechanism of the Rehabilitation Act and proscribes disability discrimination in the provision of health services. 42 U.S.C. § 18116. Section 504 of the Rehabilitation Act provides a private right of action to challenge discrimination on the basis of disability. 29 U.S.C. § 794. To bring a Section 504/Section 1557 claim, a plaintiff must show 1) that an individual has a disability; 2) he is otherwise qualified to receive the benefit; 3) he was denied the benefits of the program solely by reason of his disability; and 4) the program receives federal financial assistance. Duvall v. Cty. of Kitsap, 260 F.3d 1124, 1138 (9th Cir. 2001) "To recover monetary damages under the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant." Id. at 1138 (9th Cir. 2001).  The appropriate test for establishing intentional discrimination under the Rehabilitation Act is the deliberate indifference test. Id. at 1139. The first element of the deliberate indifference test is that the entity be on notice that an accommodation is required. Updike v. Multnomah Cty., 870 F.3d 939, 951 (9th Cir. 2017). The second element requires the plaintiff to demonstrate that the entity's failure to act is not "attributable to bureaucratic slippage that constitutes negligence," but rather is the  "result of conduct that is more than negligent, and involves an element of deliberateness." Duvall, 260 F.3d at 1139.

5

The implementing regulations for Section 1557 require that any entity covered under the law, "ensure that communications with individuals with disabilities are as effective as communications with others in health programs and activities," in accordance with the Department of Justice Guidelines under Title II of the Americans with Disabilities Act ("ADA"). 45 C.F.R. § 92.202. The DOJ guidelines require a public entity to "furnish appropriate auxiliary aids and services where necessary." 28 C.F.R. § 35.160. The guidelines further note that the "type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual, the nature, length and complexity of the communication involved." 28 C.F.R. § 35.160 (b)(2). Examples of auxiliary aids and services include qualified interpreters on-site or through video remote interpreting services, notetakers, real time computer-aided transcript services, written materials, and exchange of written notes. 28 C.F.R. §36.303(b)(1).[1] The guidelines further instruct that "a public entity shall give primary consideration to the requests of individuals with disabilities," and shall not require an adult accompanying a person with a disability to interpret or facilitate communication unless there is an emergency "involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available," or the individual has specifically requested assistance, the accompanying person has expressly agreed, and reliance on that person is appropriate "under the circumstances." 28 C.F.R. § 35.160(c)(2).

---

[1] The full list of examples of auxiliary aids and services includes: Qualified interpreters on-site or through video remote interpreting (VRI) services; notetakers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing. 28 C.F.R. § 36.303(b)(1).

**b. Analysis**

The Court denies both motions because the record indicates that there are material factual disputes as to whether Plaintiff received effective communication from UMC, and whether, if he failed to receive such communication, the failure constituted deliberate indifference. These disputed material facts and inferences must therefore be resolved by a factfinder and not this court at summary judgment.

As a preliminary matter, the Court disagrees with UMC's argument that UMC cannot be liable, since its physicians are allegedly independent contractors. The DOJ guidelines for implementing the ADA, which apply to Section 1557 claims, are clear that a public accommodation subject to Title II regulation cannot contract out its obligation to not discriminate on the basis of disability. 28 C.F.R. § 35.130(b)(1) ("A public entity, in providing any aid, benefit or service, may not, directly or through contractual, licensing, or other arrangements, [discriminate on the basis of disability]"); Castle v. Eurofresh, Inc., 731 F.3d 901, 910 (9th Cir. 2013) ("The law is clear—the State Defendants may not contract away their obligation to comply with federal discrimination laws."). If a reasonable jury concludes that UMC or its independent contractors were deliberately indifferent in their failure to provide effective communication to Plaintiff, UMC can be liable.

UMC also argues that Plaintiff did not request an interpreter himself and gave no indications that he did not understand the communications made to him by staff. However, there is no requirement under either federal disability discrimination law or UMC internal policy that the request for an interpreter be made by the patient. In this case, the Plaintiff alleges that he made the request(s) through the manner of communication that UMC itself was relying upon— communication with friends or family members who could communicate with Plaintiff. Indeed, it

would defeat the very purpose of the law if the court were to read into the statute a requirement that one must momentarily overcome one's disability to request assistance for that same disability. And in this case, UMC's argument is even more unpersuasive as it was Plaintiff's hands which were injured; the same hands that UMC suggests that he should have used to assert his request for an accommodation. Rather, the relevant inquiry is whether the entity was put on notice that a reasonable accommodation was necessary. The Court does not find it to be disputed that UMC was aware that Plaintiff was deaf and mute, as the notation was present in his medical records. At least one form recommended a plan of action that included securing an interpreter for Plaintiff. There is no indication in the record that Plaintiff affirmatively consented to written notes in lieu of interpreter services. Plaintiff expressed in his deposition testimony his confusion, anxiety, and inability to respond to what medical staff told him because of both his loss of use of his hands and the lack of a presence of an interpreter. As Plaintiff explained: "And I couldn't ask, and I couldn't ask for clarification, and I can't talk. Yeah, I don't speak. I'm not hard of hearing, or I wish I could talk a little bit, but I can't." The exceptions for use of a family member or friend as an interpreter arguably did not apply once Plaintiff was admitted to UMC, as the treatments he received were not emergency treatments, and Plaintiff contends that he did not specifically ask his friend or sister to interpret for him, and had instead wanted an official interpreter who uses relevant medical terminology.

Additionally, as Plaintiff argues in his motion, part of an entity's responsibility when providing a reasonable accommodation is a requirement to meaningfully assess the individual's limitations and comprehension abilities. Updike, 870 F.3d at 957. Based on Plaintiff's factual allegations, a reasonable juror could conclude that UMC failed to properly investigate whether their alternative means of communication were actually providing effective communication to

8

Plaintiff. Such failure could survive summary judgment on the question of deliberate indifference. Updike, 870 F.3d at 954 ("A denial of a request without investigation is sufficient to survive summary judgment on the question of deliberate indifference.").

Because the Court finds there to be disputed material questions of fact regarding whether UMC was notified of Plaintiff's need for live interpretation and whether UMC's auxiliary aids and services in lieu of live interpretation constituted effective communication, the Court denies both motions for summary judgment.

VI. **CONCLUSION**

**IT IS THEREFORE ORDERED** that Defendant University Medical Center of Southern Nevada's Motion for Partial Summary Judgment (ECF No. 27) and Plaintiff Irven Wade's Motion for Summary Judgment (ECF No. 28) are DENIED. The parties shall file a joint pretrial order by November 30, 2020 with proposed trial dates beginning February 2021.

**IT IS FURTHER ORDERED** that Plaintiff Irven Wade shall have fifteen days from the date of this order to either move for default judgment or voluntarily dismiss Defendant Clark County Board of County Commissioners pursuant to Rule 41(a)(1)(A) of the Federal Rules of Civil Procedure.

DATED October 27, 2020.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**

9